IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. | ) | |
| RENEE LUCHTMAN and | ) | |
| JEREMY THOMPSON | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Case No: _____ |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| HOMESTEAD HOSPICE | ) | |
| MANAGEMENT, LLC; | ) | |
| CREATIVE HOSPICE CARE, INC.; | ) | |
| CREATIVE HOSPICE HOLDING LLC; | ) | |
| MAHLEGA ABDSHARAFAT. | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| | ) | **DO NOT ENTER ON PACER** |
| | ) | **DEMAND FOR JURY** |

## Table of Contents

*QUI TAM* COMPLAINT ............................................................................................. 1

JURISDICTION AND VENUE ................................................................................. 1

PARTIES ..................................................................................................................... 2

APPLICABLE LAW .................................................................................................. 4

    **A.**    **THE FALSE CLAIMS ACT** ..................................................................... 4

    **B.**    **THE ANTI-KICKBACK STATUTE** ....................................................... 6

    **C.**    **THE MEDICARE HOSPICE BENEFIT** ................................................. 8

        **(i)**    **Requirements and Obligations of Hospice Medical Director, With Which Defendant Homestead Hospice Knowingly Did Not Comply, Causing False Claims.** ....................... 14

        **(ii)**    **Certifications Required to Receive Payment for Medicare Services – Which Defendant Homestead Hospice Falsified.** ...................................................... 15

**DEFENDANTS' FRAUDULENT SCHEMES** ...................................................... 16

    **I.**    **Defendants Enforce Aggressive Census Requirements by Admitting Ineligible Patients and Preventing Discharge of Ineligible Patients.** ................................................................ 17

        **A.**    **Defendants improperly boost Homestead Hospice Census by misleading patients and admitting ineligible hospice patients.** ................................................................ 18

        **B.**    **Homestead Hospice actively prevents the discharge of ineligible hospice patients.** ......... 22

    **II.**    **Defendants Violate the Anti-Kickback Statute by Paying Illegal Remuneration to Medical Directors for Hospice Referrals and to Falsely Certify Patients as Terminally Ill.** .............. 24

        **A.**    **Defendants Pay Medical Directors to Refer Hospice Patients.** .......................................... 24

        **B.**    **Homestead Hospice Medical Director Stipend Payments Grossly Exceed Fair Market Value for Hospice Medical Director Services.** ................................................................ 29

    **III.**    **Homestead Hospice Medical Directors Falsely Certify Patients as Terminally Ill.** .......... 34

        **A.**    **Homestead Hospice Medical Directors Do Not Exercise Legitimate Clinical Judgment in IDT Meetings.** ................................................................ 34

        **B.**    **Homestead Hospice Medical Directors Do Not Exercise Legitimate Medical Judgment When Executing Certifications of Terminal Illness.** ................................................................ 37

    **IV.**    **Defendant Absharafat and Homestead Management Have Been Directly Informed of Hospice Fraud, Yet Continue to Knowingly Fraudulently Bill Medicare for False Claims.** ................................................................ 43

    **V.**    **Additional Specific Examples of Ineligible Hospice Patients** ............................................. 47

**COUNT ONE** ........................................................................................................... 52

**COUNT TWO** .......................................................................................................... 54

**COUNT THREE** ...................................................................................................... 57

**COUNT FOUR** ......................................................................................................... 59

**COUNT FIVE** ........................................................................................................... 60

# *QUI TAM* COMPLAINT

Relators Renee Luchtman ("Relator Luchtman") and Jeremy Thompson ("Relator Thompson"), on behalf of themselves and the United States of America, allege and claim against Defendant Homestead Hospice Management, LLC, Defendant Creative Hospice Care, Inc., Defendant Creative Hospice Holding LLC (collectively "Homestead Hospice," "Defendant Homestead Hospice" or "the Homestead Corporate Defendants"), and Defendant Mahlega Abdsharafat ("Defendant Abdsharafat" or "Abdsharafat") as follows:

# JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act").  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.   Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the state of South Carolina, transact substantial business in the state of South Carolina and can be found here. Additionally, and as described herein, Defendants committed within this judicial district acts proscribed by 31 U.S.C. § 3729 to wit: Defendants knowingly submitted and caused to be submitted within this judicial district false claims to Medicare for hospice care that was provided to ineligible, non-terminal, patients; paid illegal

remuneration in exchange for hospice patient referrals; and submitted or caused the submission of false claims for hospice care in violation of Medicare conditions of payment. Moreover, Defendants made and used false records material to false claims, conspired to submit false claims and knowingly concealed and improperly avoided obligations to pay or transmit money or property to the United States.

## PARTIES

3.    Defendant Homestead Hospice Management, LLC is a Georgia Limited Liability Company that operates 23 hospice care agencies in Georgia, South Carolina, Alabama, Arizona, and Ohio.    Defendant Homestead Hospice Management, LLC's principal office address is 10888 Crabapple Road, Roswell, Georgia 30075.

4.    Defendant Creative Hospice Care, Inc. is a Georgia For-Profit Corporation that operates as a corporate alter-ego of Defendant Homestead Hospice Management, LLC.    Defendant Creative Hospice Care, Inc.'s principal office address is 10888 Crabapple Road, Roswell, Georgia 30075.

5.    Defendant Creative Hospice Holding LLC is a Georgia Limited Liability Company that operates as a corporate alter-ego of Defendant Homestead Hospice Management, LLC. Defendant Creative Hospice Holding LLC principal office address is 10888 Crabapple Road, Roswell, Georgia 30075.

6.    Defendant Mahlega Abdsharafat is a resident of Georgia and the owner and CEO of Creative Hospice Care, Inc. and Homestead Hospice. Defendant Abdsharafat personally directs and causes the false claims alleged herein. Moreover, Defendant Abdsharafat improperly siphons funds, derived from the submission of false claims, from Homestead Hospice for her personal financial gain.

7.    Relator Renee Luchtman has roughly 20 years of experience as a hospice industry manager and executive and was employed by Defendant Homestead Hospice as Regional Director of Operations from June 15, 2020 to September 8, 2020.    In this role, Relator Luchtman was responsible for all operations, profitability, and revenue growth of five Homestead Hospice agencies: Rock Hill, South Carolina; Greenville, South Carolina; Greenwood, South Carolina; Myrtle Beach, South Carolina and Phoenix, Arizona.    Through this personal experience, Relator Luchtman has witnessed and has knowledge of the fraud alleged herein.

8.    Relator Jeremy Thompson has over ten years of experience in the hospice and home health industry and was employed by Defendant Homestead Hospice as the Administrator of the Florence, South Carolina Homestead Hospice agency from March 2020 to September 9, 2020. Through this personal experience, Relator Thompson has witnessed and has knowledge of the fraud alleged herein.

3

9.    Prior to filing this Complaint, Relators have voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3729(e)(4)(A), Relators are the original source of the information for purposes of that section. Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators have voluntarily provided that information to the Government before filing this Complaint. Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## APPLICABLE LAW

### A. THE FALSE CLAIMS ACT

10.    The federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; (4) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government or (5) conspires to commit a violation of the False Claims Act is liable to the United

States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410 [1]), plus treble damages.  31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

11.    Under the FCA, (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1).

12.    The FCA defines the term "claim" as (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2).

13.    The FCA defines the term "obligation" as—an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

## B. THE ANTI-KICKBACK STATUTE

14.    Soon after the establishment of the Medicare system in 1965, it became apparent that the deep pockets of the national healthcare system were being abused through unethical and kickback-tainted referrals by unscrupulous physicians and medical entities.  In response, Congress enacted the federal Anti-Kickback Statute and made it a misdemeanor to provide "bribes and kickbacks" in exchange for referrals of Medicare funded medical services.  *See* Pub. L. No. 92-603, § 242(b), 86 Stat. 1329, 1419 (1972). As unethical and illegal referral patterns morphed and proliferated, Congress amended the Anti-Kickback Statute in 1977 to extend its reach beyond strictly "bribes and kickbacks" to "any remuneration" and elevated violation of the Anti-Kickback Statute from misdemeanor to felony status. *See* Medicare and Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub. L. No. 95-142, 91 Stat. 1175 (1977).

15.    In 2010, Congress amended the Anti-Kickback Statute again to specifically provide that "a claim that includes items or services resulting from a

violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. §1320a-7b(g).

16.    In part, the Anti-Kickback Statute provides as follows: (b) Illegal remunerations—

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

7

17.     A person need not have actual knowledge of the Anti-Kickback Statute or specific intent to commit a violation of this section.  42 U.S.C. § 1320a-7b(h).

18.     Even if remuneration is paid, in part, for services rendered, if one purpose of payment is to induce referral of items or services that may be paid for by federal health care programs, the arrangement violates the Anti-Kickback Statute. *See U.S. v. Greber,* 760 F.2d 68, 69 (3rd Cir. 1985); *See also United States ex rel. Hartnett v. Physicians Choice Laboratory Services, LLC,* 2020 WL 571322, at *3 (W.D.N.C., 2020).

## C. THE MEDICARE HOSPICE BENEFIT

19.     Through the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*., the United States provides health insurance coverage for eligible citizens.  The United States Department of Health and Human Services ("HHS"), specifically the Center for Medicare and Medicaid Services ("CMS") oversees the administration of Medicare.

20.     Through the Medicare Hospice Benefit, Medicare pays for hospice care for certain terminally ill patients who elect to receive such care.  *See* 42 U.S.C. § 1395d.  In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment.  *See* 42 U.S.C. § 1395d.

21.     Hospice covers a broad set of end-of-life palliative services for qualified beneficiaries who have a life expectancy of six months or less as

determined by their physician.  *See* 42 C.F.R. § 418.22.  Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physician services, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness.  *See* 42 C.F.R. § 418.202.

22.    A patient is eligible for the Medicare Hospice Benefit if the patient is entitled to Medicare Part A benefits and is certified as being "terminally ill" in accordance with Medicare Hospice Benefit requirements. 42 C.F.R. § 418.20; 42 C.F.R. § 418.22.  A patient is deemed to be terminally ill if the patient has a prognosis such that his or her life expectancy is 6 months or less if the terminal illness runs its normal course.  42 C.F.R. § 418.22.

23.    Prior to admitting a patient or billing Medicare for hospice services, a hospice provider must obtain written Certification of Terminal Illness (commonly referred to as a "COTI" or "CTI") for each patient.  *See* 42 C.F.R. § 418.22(a).

24.    The COTI must be based on the physician's clinical judgment regarding the normal course of the individual's illness.  42 C.F.R. § 418.22(b).  In making a clinical determination of whether a patient's life expectancy is 6 months or less if the disease runs its normal course, the certifying physician must consider the following:

- the primary terminal condition,

- related diagnosis(es),

- current subjective and objective medical findings,

- current medication and treatment orders, and

- information about the medical management of any of the patient's conditions unrelated to the terminal illness.

42 C.F.R. § 418.102

25.    The COTI must contain the following required elements: (1) The certification must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course; (2) Clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification; and (3) The physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms, or as an addendum to the certification and recertification forms.  42 C.F.R. § 418.22(b).

26.    The physician's narrative must include a statement directly above the physician's signature confirming that he/she composed the narrative based on his/her review of the patient's medical record or, if applicable, his/her examination of the patient.  42 C.F.R. § 418.22(b)(3)(iii).  The physician's narrative statement must also

reflect the patient's individual clinical circumstances and cannot contain check boxes or standard language used for all patients.  42 C.F.R. § 418.22(b)(3)(iv)

27.    A patient's initial, or admitting, COTI must be signed by both: (a) the hospice medical director or physician member of the patient's interdisciplinary team; and (b) the individual patient's attending physician.  42 C.F.R. § 418.22(c). However, if the hospice medical director is the patient's attending physician, the hospice medical director is the sole physician required to sign the COTI.

28.    All COTIs must be signed and dated by the physician(s) and must include the benefit period dates to which the COTI applies.  42 C.F.R. § 418.22(b)(5).  Hospice providers "must obtain written certification of terminal illness for each [benefit period]" or period the patient is under hospice care.  42 C.F.R. § 418.22.

29.    If the hospice provider cannot obtain a written COTI within 2 calendar days of the start of a hospice benefit period, the hospice provider must obtain a verbal certification within 2 calendar days.  42 C.F.R. 418.22(a)(3)(i).  After obtaining this verbal certification, the hospice must obtain a written COTI before it submits a claim for payment.  *Id.*  Written COTIs must be filed in the patient's medical record.  42 C.F.R. 418.22(d)(2).

30.    A valid written COTI, which complies with all Medicare requirements, is a material condition of payment to bill Medicare for hospice services.  *See* 42

U.S.C. §1395f(a)(7) (payment for hospice services may be made "**only if**…the medical director or physician member of the interdisciplinary group of the hospice program certif[ies] in writing at the beginning of the period, that the individual is terminally ill.") (emphasis added).

31.    If a hospice patient is still alive after the first 90 days of hospice care, the patient enters another benefit period and may be re-evaluated for hospice eligibility by the medical director – who must again assess detailed patient-specific clinical information and other documentation to determine whether the patient's life expectancy continues to be six months or less if the illness runs its normal course. If, upon considering all required factors, the medical director determines the patient's life expectancy continues to be six months or less if the illness runs its normal course, the medical director will complete and draft another COTI.  This COTI, or "recertification" must include all requirements listed *supra* and is a material condition of payment to bill Medicare for hospice services. 42 U.S.C. §1395f (payment for hospice services may be made "**only if**…the medical director or physician member of the interdisciplinary group of the hospice program recertif[ies] at the beginning of the period that the individual is terminally ill.") (emphasis added).

32.    Through Medicare and/or Medicaid (indirectly through the states), the United States reimburses hospice providers for services to qualified beneficiaries on *per diem* rates for each day a qualified beneficiary is enrolled. 42 C.F.R. § 418.302.

33.    Medicare pays for four levels of hospice care: Routine Home Care, General Inpatient Care, Continuous Home Care and Inpatient Respite Care. Routine Home Care is the most common level of hospice care and applies to any day a hospice beneficiary is at home and not receiving continuous home care. General inpatient care is provided in a hospice inpatient unit, a hospital or a skilled nursing facility (SNF) and is for pain control or symptom management that cannot be managed in other settings. Continuous Home Care is only allowed during brief periods of crises and only as necessary to maintain the individual at home. Inpatient respite care is short-term inpatient care provided to the beneficiary when necessary to relieve the caregiver. The 2020 *per diem* payment rates for each level of hospice care are provided below:

| Level of Hospice Care | Final Fiscal Year 2020 Per Diem Payment Rates |
|---|---|
| Routine Home Care (first 60 days) | $190.71 |
| Routine Home Care (after 61st day) | $150.72 |
| Continuous Care | $1,368.42 |
| General Inpatient Care | $1,001.35 |

| Inpatient Respite Care | $441.32 |
|---|---|

34.    In the case of Routine Home Care, Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided.

**(i)    Requirements and Obligations of Hospice Medical Director, With Which Defendant Homestead Hospice Knowingly Did Not Comply, Causing False Claims.**

35.    A hospice facility must designate a physician as its medical director. 42 C.F.R. § 418.102.  The medical director must be a doctor of medicine or osteopathy who is an employee, or is under contract with the hospice.  *Id.*

36.     The medical director has responsibility for the medical component of the hospice patient care program, and Medicare requires specific responsibilities and obligations of hospice medical directors.  42 C.F.R. § 418.102.

37.    For instance, the medical director must review the clinical information for each hospice patient to determine whether the patient is terminally ill, such that the patient's life expectancy is 6 months or less if the illness runs its normal course. 42 U.S.C. § 418.22.

38.    As the medical director has responsibility for the medical component of the hospice's patient care program, the Medical Director is required to perform "general supervisory services," as well as "participat[e] in the establishment of plans

of care and services, periodic review and updating plans of care, and establishment of governing policies." 42 C.F.R. § 418.304(a).

39.    Medicare payment for these required medical director services are included in the hospice *per diem* rate. *Id.* Therefore, a hospice must have a medical director perform these services if billing Medicare for hospice services.  A hospice that bills Medicare without having a medical director perform these services, as is the practice by Defendants, has billed Medicare for services that were not performed and is liable for treble damages and penalties under the False Claims Act.

### (ii)    Certifications Required to Receive Payment for Medicare Services – Which Defendant Homestead Hospice Falsified.

40.    To enroll as a Medicare provider, Defendant Homestead Hospice was required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A.  In submitting Form 855A, Defendant Homestead Hospice and each one of its agencies made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

41.     Defendant Homestead Hospice then billed Medicare by submitting claim forms (CMS Form 1450) to the fiscal intermediary responsible for administering Medicare hospice claims on behalf of the United States. *See* CMS Form 1450.  Each time it submitted a claim to the United States through the fiscal intermediary, Defendant Homestead Hospice certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

42.     Defendants and most Medicare hospice providers bill Medicare for hospice services monthly. Relators have knowledge that all Homestead agencies' monthly bills and required documentation are submitted by the Homestead Billing Department (which includes Corporate Billing Coordinator Mary Kay Dalby) to Medicare on the eighth day of each month.

43.     Accordingly, on or about the eighth day of each month, Defendants submitted or caused to be submitted CMS Form 1450 requesting payment for each patient that was enrolled with Homestead Hospice during the previous month.

## DEFENDANTS' FRAUDULENT SCHEMES

44.     Defendant Homestead Hospice's practice and policy is to admit and bill Medicare for hospice patients who plainly and objectively do not met Medicare criteria for hospice eligibility and therefore are not eligible or appropriate for the Medicare Hospice Benefit.  Defendant Abdsharafat personally directs the admission and billing of ineligible hospice patients.  Defendants admit, retain and bill the

Medicare and Medicaid program for ineligible hospice patients through a variety of schemes, including:

- Enforcing aggressive census requirements and using high-pressure and misleading sales tactics to recruit patients and their families to hospice care;

- Paying illegal remuneration to Medical Directors to induce hospice referrals and to induce false certification of terminal illness;

- Falsifying and manipulating medical records and submitting deficient certifications of terminal illness and supporting documentation;

- Ignoring and discrediting reports that otherwise demonstrate that patients do not have a prognosis of 6 months or less and are not eligible for the Medicare Hospice Benefit.

I. **Defendants Enforce Aggressive Census Requirements by Admitting Ineligible Patients and Preventing Discharge of Ineligible Patients.**

45.    Defendants seek to increase the number of patients enrolled with Homestead Hospice at all costs, even when the patients being admitted and recertified plainly do not meet Medicare Hospice Benefit Criteria.

46.    Defendant Abdsharafat demands that total number of enrolled patients in each agency – referred to as the "census" – must be increased to and maintained at extreme and unrealistic levels, regardless of whether the patients are eligible for the Medicare Hospice Benefit.    For instance, on August 13, 2020, Defendant Absharafat demanded to Relator Luchtman that the Greenville, South Carolina agency should have a census of 100 current hospice patients with no reference to any justification for this number other than financial profit.    At the time the

Greenville Agency had a census of approximately 41 patients, many of whom are ineligible and should be discharged.

47.     Similarly, Defendant Abdsharafat berates and threatens administrators and regional managers who Defendant Abdsharafat believes do not have a high enough census, including an August 5, 2020 call to Georgia Smith, Administrator of the Charleston, South Carolina agency demanding that the census in that office increase arbitrarily.

48.     Defendant Abdsharafat personally enforces these threats and retaliates against and terminates employees for not meeting her census requirements.  For example, on or around September 9, 2020, Defendant Abdsharafat terminated Alfreda Beaty, the administrator of the Greenville agency, because the Greenville agency's census was deemed to be too low.

49.     Any protestations that current or prospective patients are ineligible for the Medicare Hospice Benefit are ignored by Defendant Abdsharafat and Homestead in the relentless quest to grow Homestead's census.

## A. Defendants improperly boost Homestead Hospice Census by misleading patients and admitting ineligible hospice patients.

50.     Defendant Homestead Hospice employs Account Executives or "marketers" to find and recruit patients to be enrolled in Homestead Hospice end-of-life care.  Homestead marketers are paid a base salary but must meet an aggressive quota of patients admitted each month.  If the marketer exceeds the quota of admitted

18

patients, they receive a bonus; but if the marketer does not meet the quota, the marketer is subject to discipline and will be terminated. Indeed, Relators have knowledge of several marketers that have been terminated by Homestead for not meeting the unreasonable and extreme admission quotas.

51.    Homestead marketers are extremely aggressive when soliciting patients and resort to misleading patients about the nature of hospice care and what the Medicare Hospice Benefit entails—including that the patient is agreeing to forgo Medicare covered curative care by electing palliative hospice treatment.

52.    In one egregious example, on August 22, 2020, Patient P.F., a patient Defendants admitted to end-of-life hospice care with the Columbia, South Carolina Homestead Hospice Agency informed Homestead Hospice Nurse Tonya Bozeman that "she does not know why she is on hospice and does not require hospice services because she is able to cook, clean and shop on her own when needed."[1] Further, Patient P.F. informed Ms. Bozeman that "she had no idea what hospice was—no one explained it to her and she felt like the marketer was doing her doctor a favor [by admitting her to end-of-life hospice care]."

---

[1] In addition to the manipulative marketing tactics exemplified by Patient P.F., Patient P.F. was also clearly ineligible for the Medicare Hospice Benefit as she was admitted under a diagnosis of End-Stage Renal Disease, yet the patient who was documented as alert and oriented, ambulatory and able to care for herself was never told she was diagnosed with kidney disease and never received dialysis treatment. Accordingly, all claims submitted by Homestead for Patient P.F.'s care are false.

53.    Similarly, Defendants admitted Patient B.G. to the Columbia, South Carolina Homestead Hospice Agency on May 4, 2020.  However, on August 12, 2020, Patient B.G. requested to revoke her hospice election and informed Director of Nursing Kim Sussewell that "she does not need hospice anymore and was trying to come off hospice and Homestead Case Manager [Margaret Barker] discouraged her."[2]  Ms. Sussewell noted that "Patient was upset that she could not come off hospice."  However, Ms. Sussewell informed Patient B.G. that hospice is her decision and Patient B.G. immediately revoked her hospice election.  Ms. Sussewell also informed Regional Director of Operations Natasha Nadkarni and Regional Director of Business Development John Bolek of this situation—yet no disciplinary action was taken against Ms. Barker for misleading Patient B.G. to believe that she could not make her own healthcare decision to discontinue hospice services.

54.    Another misleading strategy used by Homestead Hospice marketers is circumventing attending physicians who – by legitimately exercising their medical judgment – do not agree that a patient is terminally ill and will not admit the patient to hospice care.

---

[2] Patient B.G. is also clearly ineligible for the Medicare Hospice Benefit as she was admitted under a diagnosis of Heart Disease, but her documentation clearly refutes that her Heart Disease is at terminal state as she has 99% oxygen saturation at rest, no shortness of breath, does not use oxygen and has a regular heart rhythm.  Accordingly, all claims submitted by Homestead for Patient B.G.'s care are false.

55.     Because Medicare requires signatures from both the patient's attending physician and the hospice medical director on an initial hospice admission COTI, Homestead Hospice marketers are sometimes faced with an attending physician who, based on their knowledge and assessment of their own patient, does not agree that the patient is terminally ill and refuses to sign a COTI admitting the patient to the Medicare Hospice Benefit.

56.     In this situation, the Homestead marketer simply side-steps the patient's attending physician by manipulating the patient into switching their attending physician from the non-agreeable physician to a Homestead Hospice Medical Director.  Once this is accomplished, the Homestead Hospice Medical Director is able to sign as both the attending physician and medical director.

57.     Specific Homestead Hospice marketers and medical directors that execute this manipulative attending physician switch include Margot Wingard, a marketer in the Columbia, South Carolina Homestead agency and Dr. Michael Gibson, medical director in the Columbia, South Carolina agency.

58.     Most outrageously, Ms. Wingard often deploys this strategy upon vulnerable patients that are referred from the South Carolina Adult Protective Services Department.

59.     As described herein, Homestead Hospice Medical Directors do not exercise legitimate clinical judgment when assessing patients for hospice eligibility

but instead "rubberstamp" patient COTIs in exchange for exorbitant monthly stipends and to appease Homestead Hospice's entirely profit driven motives. Accordingly, once the marketer manipulates the patient into firing her attending physician and switching to the Homestead Medical Director, the patient – who has been determined by their actual attending physician to be inappropriate for hospice – is inevitably admitted without a legitimate prognosis of terminal illness by any physician.

**B. Homestead Hospice actively prevents the discharge of ineligible hospice patients.**

60.    To prevent ineligible patients from being discharged, Homestead Hospice requires that each patient determined to be inappropriate for hospice and proposed for discharge by field clinicians be routed to the corporate "Medical Review Group" to make for the ultimate decision on the patient's eligibility.

61.    The "Medical Review Group" is led by Ali Kaviani.  Ali Kaviani was purportedly a physician in Iran but is not a licensed physician in the United States. Despite being referred to as "Dr. Kaviani" within Homestead Hospice, Mr. Kaviani is not a licensed physician, does not and cannot sign patient COTIs, nor exercise the required physician's medical judgment to determine a patient's eligibility for the Medicare Hospice Benefit.  Instead, Mr. Kaviani simply serves as a proxy for Defendant Abdsharafat's unbridled retention of non-eligible hospice patients.

62.    Therefore, Mr. Kaviani and Defendant Abdsharafat (who is not clinically trained) hold the ultimate decision of whether to discharge a patient who has been determined by clinicians to be ineligible for hospice care.    Nearly invariably, Mr. Kaviani and Defendant Abdsharafat overrule the in-field clinician and determine that the patient is eligible and Homestead continues to bill Medicare for end-of-life hospice care for the ineligible patient.

63.    The Homestead Hospice Medical Directors who are responsible for determining a patient's terminal status hold no actual authority to discharge an ineligible patient.    Instead, as deliberately designed by Homestead Hospice and Defendant Abdsharafat, Homestead Medical Directors simply sign patient COTIs— falsely certifying that the patient is eligible for the Medicare Hospice Benefit—when a legitimate review of the patient's terminal prognosis would clearly demonstrate that the patient is not eligible for the Medicare Hospice Benefit.

64.    Another way Homestead Hospice pressures employees into retaining and billing for ineligible hospice patients, is by carefully monitoring and enforcing limits on the "live discharge rate" – which is the percentage of patients discharged alive from hospice care each month, as opposed to patients who pass away while on hospice care.

65.    Homestead Hospice executives, led by Vice President of Operations Amanda McKissick, hold a weekly "Operations Strategy Call."    In this weekly

conference call, which must be attended by all Regional Directors, including Relator Luchtman, Ms. McKissick berates Homestead Hospice offices that have any live discharges.

66.    However, due to years of habitually admitting and recertifying ineligible hospice patients, Homestead Hospice's rolls are filled with ineligible hospice patients and the live discharge mandate is deliberately designed to prevent agencies from discharging ineligible patients.

67.    Specifically, Relators have knowledge that Regional Directors and administrators have been berated and disciplined for discharging patients—despite those patients being clearly ineligible for the Medicare Hospice Benefit and having no legitmate COTI and not having been assessed for eligibility by a physician.

## II.    Defendants Violate the Anti-Kickback Statute by Paying Illegal Remuneration to Medical Directors for Hospice Referrals and to Falsely Certify Patients as Terminally Ill.

### A. Defendants Pay Medical Directors to Refer Hospice Patients.

68.    Homestead Hospice intentionally selects and retains Medical Directors based on the expectation and provision of hospice referrals in exchange for flat-fee Medical Director stipends.

69.    In exchange for illegal remuneration, Homestead Hospice Medical Directors refer patients exclusively to Homestead Hospice for end-of-life care.

70.     Moreover, when Homestead Hospice Medical Directors leave their position as independent contractors with Homestead, they often take their patients with them—further demonstrating that Homestead's per diem billing for hospice patients is often contingent on paying the patient's physician as a medical director. This is a plain and obvious *quid pro quo*.

71.     Homestead Hospice Medical Directors are paid by monthly stipend and make no effort to keep time or activity logs.  In other words, the Medical Directors' compensation is not tied to any legitimate work, but instead to the patients they refer.

72.     In April 2020, Relator Thompson raised concerns to Defendants that paying hospice medical directors by a flat stipend and not even attempting to record medical directors' hourly work was a major compliance problem because Homestead had no way to justify that physicians were being paid a Fair Market Value for their services.  Relator Thompson would soon find out that Homestead was paying medical directors far above Fair Market Value in exchange for referring patients—which was precisely why Homestead did not want to document the minimal volume of legitimate work performed.

73.      Defendants recognized Relator Thompson's concerns as valid, and allowed Relator Thompson to request the medical directors in the Florence, South Carolina office to keep hourly time logs. Yet, Homestead did not implement

company-wide initiatives to correct what it plainly knew amounted to egregious AKS violations.

74.    When Relator Thompson required the Florence, S.C. Medical Directors to keep hourly time logs to attempt to justify their flat monthly stipend, Medical Director Dr. Emmanual Quaye resigned immediately, knowing that his hourly work would not justify his monthly stipend and could lead to scrutiny of the clearly improper arrangement.

75.    After Dr. Quaye's departure in May 2020, Dr. Albert Mims, who previously was an assistant medical director in the Florence Agency, took over as the primary medical director. Dr. Mims, however, also resisted Relator Thompson's efforts to institute reasonable compliance measures such as requiring hourly timekeeping; Dr. Mims stated he wanted to go back to "his original agreement."

76.    Under this "original agreement," Dr. Mims was only "involved with" the patients whom he referred to Homestead Hospice.  Dr. Mims did not perform any services related to any of Homestead Hospice patients except his referrals, did not attend any IDT meetings, did not sign COTIs for any patient other than his referrals, and did not keep time logs.

77.    Under this arrangement, Dr. Mims was paid $1600 monthly and $120 for each Face to Face visit he performed with his referred patients.  Essentially, Dr.

Mims, for several years prior to May 2020, was paid $1,600 per month to refer patients to Homestead Hospice and remain the patients' attending physician.

78. Due to disagreements over timekeeping and Dr. Mims' resistance to performing required hospice medical director duties, such as attending IDT meetings, Dr. Mims resigned as Medical Director of the Florence Agency on July 31, 2020. But, it would not be long before Homestead Hospice senior management again solicited Dr. Mims' referrals.

79. On August 20, 2020, Relator Thompson was on a conference call with the following Homestead Hospice Corporate employees: Theresa Solerno, Vice President of Clinical Operations; John Bolek, Regional Director of Business Development; Sharon Taylor, Regional Director of Clinical Operations; and Natasha Nadkarni, Regional Director of Operations. On this conference call, Ms. Solerno asked Relator Thompson about Dr. Albert Mims and why Dr. Mims was no longer serving as a medical director. Relator Thompson replied that the problem with Dr. Mims was that he did not want to perform the required duties of a hospice medical director such as attending IDT meetings at all and only wanted to sign COTIs for his own referrals. At which point, Ms. Nadkarni said **"I think we should try to salvage Dr. Mims as a Medical Director because he was a good referral source."** Both Mr. Bolek and Ms. Taylor agreed with this suggestion. It was agreed that Ms. Solerno would lead the initiative to re-recruit Dr. Mims to his "original agreement."

80.    Accordingly, Homestead Hospice executives determined that Homestead would seek to pay Dr. Mims a flat monthly stipend in direct exchange and solely for referring patients to Homestead, knowing that he would not attend IDT meetings and that Homestead accordingly would not provide a physician-led IDT review for its patients as required by Medicare for payment.

81.    Similarly, the recruitment of Dr. Johnny Dias, a medical director in the Greenville, South Carolina Agency, demonstrates Homestead's specific intent to recruit physicians to be medical directors based on the physician's ability and willingness to refer hospice patients and little else.

82.    Relator Luchtman is knowledgeable of Dr. Dias' recruitment and onboarding.  Dr. Dias was selected and offered the position of Homestead Hospice Medical Director because Dr. Dias operates his own house call medical practice that provides care to many elderly patients in the Greenville-Spartanburg, S.C. area and Homestead viewed him as a valuable referral source.

83.    Further, on August 10, 2020, Defendant Abdsharafat visited the Greenville office for two primary reasons.  First, she held an agency-wide meeting and screamed and berated the entire staff because she believed the census was too low.  At this time the Greenville census was approximately 45 patients and Defendant Abdsharafat demanded that the census be increased to 100 patients.

84.     The other reason for Defendant Abdsharafat's visit was to take Dr. Dias and several Homestead staff to an expensive dinner to discuss the low census and encourage Dr. Dias to refer and admit patients to boost census as well as implore Dr. Dias to encourage other Greenville area physicians to refer patients to Homestead. During this expensive meal, Defendant Abdsharafat explained to Dr. Dias that the Greenville census had dropped and pleaded with Dr. Dias to "help [Homestead] out."

85.     Throughout this visit to Greenville, Defendant Abdsharafat made it abundantly clear that, as a new Homestead Hospice Medical Director, Dr. Dias was expected to increase the number of patient on the Greenville agency census.   In exchange for doing so, Dr. Dias would be paid a $2,500 per month stipend—with no accountability or tracking of any hourly work.

**B. Homestead Hospice Medical Director Stipend Payments Grossly Exceed Fair Market Value for Hospice Medical Director Services.**

86.     Not only do Homestead Hospice Medical Directors receive a flat stipend in exchange for referring patients, with no other accountability for hours worked or other metric of contribution aside from volume of referrals, but the amount of these monthly payments far exceed Fair Market Value for the services provided by a legitimate Hospice Medical Director.

87.     Through their extensive experience as hospice managers and executives, Relators have knowledge that the Fair Market Value paid to hospice medical directors is roughly $130-$155 per hour.  A specialist physician, such as a

pulmonologist or cardiologist, may command a higher rate of roughly $180 per hour. Relators have knowledge that paying a hospice medical director over $200 per hour clearly exceeds Fair Market Value and, if known to CMS or HHS, a hospice provider should expect scrutiny from such an arrangement.

88.    Moreover, it is obvious that to even calculate or substantiate Fair Market Value of medical director compensation, a hospice medical director must keep hourly time logs.

89.    With this Fair Market Value background, it is apparent that Homestead Hospice pays its Medical Directors grossly excessive stipends, far outside Fair Market Value.  For example, Dr. William Chastain – a Homestead Hospice Medical Director in the Greenville, South Carolina agency– is paid a monthly stipend of $4,000 per month.[3]

90.     Relator Luchtman primarily worked out of the Greenville agency and witnessed Dr. Chastain's activities.  For this guaranteed monthly payment of $4,000, Dr. Chastain does, at most, three to four hours of work per month.  This effective hourly rate of $1,000 to $1,333 far exceeds Fair Market Value for hospice medical director services.

---

[3] Relators have knowledge that other Homestead Hospice Medical Directors monthly stipends are even larger.  For example, Dr. Kieran Cooper, Medical Director of the Roswell, Georgia agency is paid $5,500 per month to be a hospice medical director.  Neither Dr. Cooper nor Homestead Hospice makes any effort to record Dr. Cooper's hourly work because both know that the actual time worked by Dr. Cooper is minimal and does not come close to justifying this exorbitant monthly salary.

91.    In exchange for this exorbitant monthly payment, Dr. Chastain's duties are to sit through two roughly one-hour long IDT meetings per month and show up to the Greenville Homestead Hospice agency at his leisure and sign waiting stacks of patient COTIs, orders, medication changes and other documents.

92.    When Relator Luchtman asked Homestead leadership why Defendants pay Dr. Chastain such a monthly stipend so starkly at odds with the market rate, she was informed that Dr. Chastain receives this stipend not for any legitimate reason but that "he is a personal friend of [Defendant Abdsharafat]."

93.    Relators have knowledge that Defendants funnel even more money to unscrupulous Medical Directors "off the books."  For example, the financial statements for the Homestead Hospice Rock Hill, S.C. agency show that the agency is actually spending $8,300 per month for medical director services. The contract for the medical director of the Rock Hill Agency, however, provides for only a monthly payment of $2,400 to Medical Director Dr. Otis Speight.

94.    Relator Luchtman questioned Homestead Corporate Management about this obvious discrepancy in medical director spending.  Despite multiple efforts to obtain clarification, Homestead Corporate Management has not responded to Relator Luchtman regarding this clear discrepancy.

95.    Similarly, Relator Thompson's Florence Agency financial statements show Social Worker actual expenditures at $12,000 per month—far more than the

single social worker in the Florence Agency is paid.  Relator Thompson questioned this discrepancy to Homestead's Corporate Management but received no response.

96.    Representative examples of patients referred to Homestead Hospice by Medical Directors—in exchange for illegal remuneration and in violation of the Anti-Kickback Statute—include:

(a) Patient L.L. was referred to the Columbia, South Carolina Agency by Medical Director Dr. Albert Mims in exchange for illegal remuneration in the form of a medical director stipend, and admitted on January 14, 2020. Thereafter, Homestead billed false claims to Medicare for Patient L.L., on or about the eighth day of each month.

(b) Patient B.C. was referred to the Florence, South Carolina Agency by Medical Director Albert Mims in exchange for illegal remuneration in the form of a medical director stipend, and admitted on February 12, 2020. Thereafter and until August 2020, Homestead billed false claims to Medicare for Patient B.C., on or about the eighth day of each month.  In August 2020, after Dr. Mims resigned as the Florence Medical Director, and was no longer receiving illegal remuneration from Homestead, he moved Patient B.C. to different hospice provider.

(c) Patient E.S. was referred to the Florence, South Carolina Agency by Medical Director Albert Mims in exchange for illegal remuneration in the

form of a medical director stipend, and admitted on May 27, 2020. Thereafter and until August 2020, Homestead billed false claims to Medicare for Patient E.S., on or about the eighth day of each month. In August 2020, after Dr. Mims resigned as the Florence Medical Director, and was no longer receiving illegal remuneration from Homestead, he moved Patient E.S. to different hospice provider.

(d) Patient C.D. was referred to the Selma, Alabama Homestead Hospice Agency by Medical Director Dr. Ikram Hussein in exchange for illegal remuneration in the form of a medical director stipend, and admitted on March 22, 2018. Thereafter, Homestead billed false claims to Medicare for Patient C.D., on or about the eighth day of each month.

(e) Patient C.A. was referred to the Athens, Georgia Homestead Hospice Agency by Medical Director Dr. Robert Klassen in exchange for illegal remuneration in the form of a medical director stipend, and admitted on January 5, 2017. Thereafter, Homestead billed false claims to Medicare for Patient C.A., on or about the eighth day of each month.

**These Patients are representative examples of referrals procured by illegal kickbacks that caused false claims to be submitted to Medicare.**

### III.    Homestead Hospice Medical Directors Falsely Certify Patients as Terminally Ill.

### A. Homestead Hospice Medical Directors Do Not Exercise Legitimate Clinical Judgment in IDT Meetings.

97.    Homestead Hospice patient rolls are inundated with blatantly ineligible patients; no reasonable physician would certify many of Homestead's patients as terminally ill.

98.    At Hospice IDT meetings, Medical Directors and the Interdisciplinary Team are required to discuss each patient's condition, review and discuss patients' terminal prognoses and make a clinical determination whether each patient has less than six months to live if the disease runs its normal course and is therefore eligible for the Medicare Hospice Benefit.  However, as Relators have witnessed on multiple occasions and in multiple agencies, this required process does not occur in Homestead Hospice IDT meetings.

99.    Instead, as Relator Thompson has witnessed on multiple occasions, including an IDT meeting during the week of March 9, 2020 in the Florence, S.C. agency, Homestead Hospice IDG meetings proceed by a nurse simply reading the most recent nursing note from the patients' file, then moving to the next patient and reading that nursing note, then moving to the next patient.  There is no comment, no discussion of whether the patient is receiving the optimal palliative care, and no

34

discussion of eligibility.  The Medical Director sits in silence and does not participate in any meaningful way.

100.    Even when a nursing note for a patient that has been on hospice service for several years is read, neither the clinicians in IDT or Medical Director acknowledge or recognize the patient's extreme length of stay—which should trigger at least a discussion of why or why not the patient continues to be eligible for the Medicare Hospice Benefit.

101.    For example, during this early March 2020 IDT meeting in the Florence, S.C. agency, a nursing note was read to the group describing Patient R.B.—who had been on end-of-life care for nearly two years with a diagnosis of end-stage Alzheimer's disease.  The nursing note—read aloud to the group—stated Patient R.B. was living at home, alone.

102.    Relator Thompson interrupted the repetitious flow of the IDT meeting and raised the questions, "how is an end-stage Alzheimer's patient living alone?" and "is this patient really end-stage Alzheimer's?"  To any objective health care or hospice professional, these questions are obvious because if a patient is actually within six months of death due to end-stage Alzheimer's Disease, the patient cannot speak, cannot walk, cannot perform any activities of daily living and certainly is unable to live alone in their home.

103.   Despite Relator Thompson's valid questions, the entire IDT group including Medical Director Emmanual Quaye sat silent, did not even acknowledge Relator Thompson's concerns or questions and simply moved on to the next patient—in tacit acknowledgement that the patient was not actually at the end-stage of Alzheimer's Disease but would be falsely re-certified as terminally ill.   No medical judgment was excercised at all.  Patient R.B. was denied the medical service of having a physician-led IDT review and analyze her care and was simpy re-certified as a profitable patient for the Defendants and a source of income for the Medical Director who provided zero guidance to the IDT.

104.   Thereafter, despite Patient R.B. clearly not being eligible for the Medicare Hospice Benefit, Dr. Quaye falsely re-certified Patient R.B. as terminally ill and eligible for the Medicare Hospice Benefit.  As of August 25, 2020, Patient R.B. remains on end-of-life hospice care and each month, Homestead Hospice bills Medicare for and receives *per diem* payments as a result of false certifications of terminal illness for Patient R.B.

105.   Similarly, on July 30, 2020, Relator Luchtman observed an IDT meeting in Greenville, S.C. and witnessed the same repetitious process—devoid of any semblance of physician clinical judgment. There was no discussion of whether patients were actually eligible for the Medicare Hospice Benefit.  Medical Director Dr. William Chastain did not attend in person, but purportedly listened by phone,

saying nothing, offering no input.  He did not comment on any patients discussed throughout the IDT.  Every patient that was scheduled for admission or re-certification was certified as eligible—with no legitimate discussion, review of medical records, or input at all from the certifying physician.

106.    Relators also have knowledge that in July 2020, Medical Director Dr. Michael Gibson slept through an IDT meeting in the Columbia, S.C. agency. Moreover, Regional Director of Clinical Operations Sharon Taylor was present and witnessed Dr. Gibson sleeping through the IDT meeting.  Not only did Ms. Taylor not reprimand or even wake up Dr. Gibson, but when Director of Nursing Kim Sussewell commented to the group that Dr. Gibson was sleeping, Ms. Taylor responded by instructing Ms. Sussewell to "hush," so she would not disturb the sleeping medical director.  Despite obviously not making any clinical determinations while asleep, every patient that was scheduled for admission or recertification at this IDT was deemed eligible by Homestead and rotely signed by Dr. Gibson.

## B. Homestead Hospice Medical Directors Do Not Exercise Legitimate Medical Judgment When Executing Certifications of Terminal Illness.

107.    Homestead Hospice Medical Directors sign COTIs without assessing whether patients are, in fact, terminally ill, or making any determination at all.

108.    Relators have witnessed multiple Medical Directors simply sign stacks of COTIs without reviewing or assessing any clinical notes, findings or patient information.  In fact, the only page reviewed is the page containing the signature

line, and the only line on that page reviewed is the line where the physician scratches the signature.

109.    Claims for payment of hospice services based on such "rubberstamped" COTIs are false.  Not only are Defendants charging the United States for Medical Director services – in the form of patient assessments and reassessments – that are never performed, Defendants are also depriving Medicare beneficiaries of the most basic form of health care by telling them that a physician has determined that they are terminally ill and should prepare for death when, in reality, no physician has made such a determination.

110.    Specifically, on two separate occasions in June 2020, Relator Thompson has witnessed Dr. Albert Mims sign stacks of documents—including COTIs—without reviewing any medical documentation at all.

111.    On these occasions, and pursuant to Homestead's standard practice, Homestead Hospice staff compile all documents that require the medical director's signature in a stack and place sticky "sign here" tabs on the documents to quickly identify where signatures are required.  The stack of documents includes medication orders, plans of care, and COTIs along with any other documents requiring the medical director's signature.  But the only thing the doctor sees is the sticky "sign here" tab.

112.    The stack is then presented to the Medical Director for signatures.  On these June 2020 occasions, Relator Thompson handed the stack to Dr. Mims and witnessed Dr. Mims flip through the various documents, briskly signing at each pre-noted "sign here" sticky tab. Dr. Mims swiftly signed fifteen to twenty different patient documents and handed them back to Relator Thompson.  The entire process took less than four or five minutes or as little as 10-20 seconds per patient.  At no point did Dr. Mims review or even comment on any medication orders, plans of care or COTIs.  He simply signed what the Homestead staff prepared—no questions asked.

113.    Similarly, on multiple occasions including in July 2020, Relator Luchtman has witnessed Greenville Medical Director Dr. William Chastain's process of signing COTIs.  In the Greenville office, the staff knows to leave the stack of prepared, "sign here" tabbed, documents at the front desk.  Dr. Chastain will arrive unannounced, leave his car running, and walk in to swiftly sign all the documents—which includes orders, plans of care and COTIs—while standing at the front desk. Then he leaves without a word about a single patient.  Dr. Chastain does not review or question any of the documents nor speak to anyone about the end-of-life care patient care he is approving. He simply signs what the Homestead staff prepared—without any review—no questions asked.

114.    Homestead Hospice staff even prepare sections of COTIs that must be personally completed by the Medical Director – specifically the required physician narrative.

115.    Often the COTI narrative statements are simply cloned by copying and and pasting from the patient's nursing notes and clearly not composed by the certifying physician.

116.    Specifically, Columbia, South Carolina Homestead Hospice office staff employee John Crane often prepares physician COTIs, including the required physician narrative.  Medical Directors Dr. Michael Gibson, Dr. Emmanuel Quaye, and Dr. Albert Mims have signed COTIs containing narrative statements composed by Homestead Hospice staff, including Mr. Crane.   They neither composed nor reviewed the narratives.

117.    Submitting a COTI with a physician narrative composed by someone other than the certifying physician results in a false claim because the COTI includes a mandatory statement directly above the physician's signature confirming *that he/she composed the narrative based on his/her review of the patient's medical record or, if applicable, his/her examination of the patient.*   42 C.F.R. § 418.22(b)(3)(iii)(emphasis added).

118.    For example, Patient V.T., was admitted to Homestead Hospice's Columbia, S.C. agency on July 6, 2018 with a diagnosis of COPD.  The narrative

statement that is included in Patient V.T.'s initial COTI is a near mirror image of Homestead Hospice Nurse Pamela Crisp's nursing note's narrative notes. It does not contain any work product or review by the physician.

119. Perhaps most glaringly obvious is that Homestead Hospice often submits COTIs and claims for payment to Medicare program that do not even include physician signatures, narrative statements, or required Face-to-Face Attestations. As these COTIs do not meet Medicare Conditions of Payment, they are *per se* invalid and all claims submitted by Defendants based on these wholly deficient COTIs are false.

120. Examples of these wholly deficient and invalid COTIs include:

a) Patient R.C., who was admitted to the Cartersville, Georgia Homestead Hospice Agency on January 5, 2017. Patient R.C.'s initial COTI was supposed to be signed by Homestead Medical Director Dr. Anthony Captain as both the Medical Director and Attending Physician but is not signed at all. Further, Patient R.C.'s initial certification does not contain a narrative statement justifying admission to hospice services. The space for the narrative statement is simply blank. Dr. Captain made no evaluation of Patient R.C. and made no medical determination that Patient R.C. was terminally ill and eligible for the Medicare Hospice Benefit. Accordingly, all hospice services billed to Medicare by Homestead for Patient R.C. are

false claims.[4] Similarly, a COTI for Patient R.C.'s sixth hospice certification period, spanning 12/31/2017-2/28/2018, was signed by Dr. Captain but there is no narrative statement and no Face-to-Face Attestation—rendering all claims for payment false.   As of August 2020, over three and a half years since his admission, Patient R.C. remains on end-of-life hospice care, without any physician narrative attesting to his eligibility.

b) Patient V.T. was admitted to the Columbia, South Carolina Homestead Hospice Agency on July 6, 2018.  Patient V.T.'s initial certification is not signed by a physician.   Therefore, all subsequent claims for payment submitted by Homestead Hospice to Medicare for Patient V.T. are false.[5]

---

[4] While all claims billed for Patient R.C. are false because there is no valid certification of terminal illness, Patient R.C. is also ineligible for the Medicare Hospice Benefit because he is not terminally ill.  Patient R.C. was admitted under an Alzheimer's Disease diagnosis on January 5, 2017, yet on January 24, 2017, a Homestead Hospice nursing assistant noted "Patient is ambulatory does not use assistive device."  Being able to ambulate without an assistive device demonstrates Patient R.C. does not have an actual terminal diagnosis for end-stage Alzheimer's disease.

[5] While all claims billed for Patient V.T. are false because there is no valid certification of terminal illness, Patient V.T. is also ineligible for the Medicare Hospice Benefit because he is not terminally ill.  Patient V.T. was admitted under a diagnosis of COPD, however Patient V.T. reports he continues to smoke two packs of cigarettes per day and does not use oxygen supplement.  Patient V.T. lives alone, leaves home on overnight trips by himself, and cares for multiple dogs—all contrary to Homestead's false claim that Patient V.T. actually has a terminal COPD diagnosis. Yet, over two years after his admission, Patient V.T. is still on end-of-life hospice care in August 2020 without any legitimate COTI.

### IV.    Defendant Absharafat and Homestead Management Have Been Directly Informed of Hospice Fraud, Yet Continue to Knowingly Fraudulently Bill Medicare for False Claims.

121.    Numerous Homestead Hospice clinicians and employees—including Relators—have informed Homestead Hospice Corporate Officers, including Defendant Abdsharafat, of ongoing hospice fraud, ineligible patients, and false claims.  Yet, Defendants have taken no action to refund the Medicare program and continue to aggressively recruit and bill Medicare for ineligible patients.

122.    In mid-2020, Florence, South Carolina Homestead Hospice nurses Meredith Myers and Diane "April" Sargent recognized that Homestead was systematically admitting and recertifying ineligible patients.  The final straw for Ms. Myers and Ms. Sargent was when Ms. Myers made a visit to Patient L.J. who was admitted to Homestead Hospice under a diagnosis of Alzheimer's disease on May 21, 2020.

123.    Patient L.J. is noted in a May 21, 2020 Certification of Terminal Illness (which is not actually signed by a physician and thus *per se* invalid) as able to ambulate with a walker and alert and oriented. First, being able to ambulate and being alert and oriented directly contradicts Homestead Hospice's false certification that Patient L.J. is not expected to live more than six months due to end-stage Alzheimer's Disease.    Further, when Ms. Myers visited Patient L.J., she realized that Patient L.J.—purportedly an end-stage Alzheimer's patient—was living alone

at her home.  Accordingly, the information in the COTI actually read more like a narrative as to why the patient should not be admitted and did not have a terminal illness, rather than a certification that the patient was terminal.

124.    Confronted with a blatantly ineligible hospice patient, in early July 2020, Ms. Myers and Ms. Sargent reported that this patient needed to be immediately discharged.    Ms. Myers and Ms. Sargent reported this to Director of Nursing Yolanda Hollaman.  Ms. Hollaman completely dismissed their concerns, would not even entertain the idea of discharging Patient L.J. and refused to even discuss Patient L.J.'s eligibility status in the next upcoming IDT meeting.

125.    Further, both nurses, who are experienced in hospice care, were stunned at the impropriety of having a corporate board of non-physicians, not the agency's medical director, hold authority over patient discharges.  Nevertheless, they reported the ineligible patient and required discharge to Sharon Taylor, Regional Director of Clinical Operations and Theresa Solerno, Vice President of Clincial Operations.

126.    Ms. Taylor and Ms. Solerno recognized the significance of the nurses' reports and initially feigned concern.  Ms. Taylor assured the nurses that Homestead would conduct a 100% chart audit and review all the Florence agency's patients for eligibility.    Homestead suspended the Director of Nursing Yolanda Holloman pending the investigation.  Ms. Solerno even informed the nurses that Homestead

would have to self-disclose to Medicare any ineligible patients, including Patient L.J.

127.   However, the feigned concern was short lived and within five days, Homestead presented their "conclusion."  Homestead claimed that the experienced hospice nurses were wrong, Patient L.J. was eligible for the Medicare Hospice Benefit. Yet, Homestead provided no valid clinical justification for this determination and instead claimed Ms. Myers and Ms. Sargent were simply trying to disparage Director of Nursing Yolanda Holloman.  Further, Homestead management claimed they had completed a full chart audit of all 51 patients in the Florence agency and that none were ineligible.

128.   This was patently false because, as detailed in this Complaint, the Florence Agency is filled with ineligible patients, including Patient L.J.  Eventually, due to the continued scrutiny surrounding Patient L.J., Director of Nursing Yolanda Holloman herself discharged Patient L.J. in mid-August 2020 for not meeting Medicare Hospice Benefit Criteria.

129.   After this farcical conclusion, Ms. Sargent and Ms. Myers resigned from Homestead on July 13, 2020, effective immediately, out of concern that the outright fraud being committed by Homestead would jeopardize their nursing licenses.

130.    Following this tumultuous resignation, Corporate Compliance Officer Sandra Stevens contacted Relator Thompson on July 17, 2020 and asked if he was aware of ineligible hospice patients admitted to Homestead.

131.    Relator Thompson informed Ms. Stevens that he was aware of numerous ineligible patients, and provided Ms. Stevens with specific examples of clearly ineligible patients, including Patient L.J.

132.    Relator Thompson also informed Ms. Stevens that he had previously reported to Medical Director Emmanual Quaye and Defendant Abdsharafat that Patient R.B. was clearly ineligible because she too was listed as terminally ill due to end-stage Alzheimer's Disease but was able to live alone.   Relator Thompson informed Ms. Stevens that in addition to the March 2020 IDT meeting described *supra* where Medical Director Emmanual Quaye refused to acknowledge Relator Thompson's concerns that Patient R.B. was ineligible, Relator Thompson also reported this issue directly to Defendant Abdsharafat on approximately March 17 or 18, 2020.

133.    Relator Thompson's direct reporting of Patient R.B.'s ineligibility to Defendant Abdsharafat came during a training session at Homestead corporate headquarters in Roswell, Georgia where Defendant Abdsharafat asked Relator Thompson "how everything was going?"  Relator Thompson responded by voicing his concerns about Patient R.B.'s clear ineligibility and that Patient R.B.'s ability to

live alone at home—without a caretaker—directly contradicted Homestead's false claim that Patient R.B. was terminally ill due to Alzheimer's Disease.    Relator Thompson also informed Defendant Abdsharafat that he was troubled that no one in IDT – including Dr. Quaye – acknowledged his concerns.

134.    Defendant Abdsharaft, like Ms. Taylor and Ms. Solerno, feigned concern and said "I need to find out how this happened."  Defendant Abdsharafat then brought in Ali Kaviani, the *de facto* corporate medical director, who holds authority over all discharges but is not a physician.  Mr. Kaviani assured Relator Thompson that he would "look into it" and "needed to get more information." However, Kaviani and Defendant Abdsharafat did nothing and Medicare continues to be billed for end-of-life hospice care for Patient R.B.—despite known ineligibility.

135.    Accordingly, Defendants have been well informed of widespread fraud and specific ineligible hospice patients, yet have taken no action to refund Medicare and continue to knowingly bill Medicare for ineligible patients.

**V.    Additional Specific Examples of Ineligible Hospice Patients**

136.    Relators know of scores of ineligible hospice patients that have been knowingly admitted, recertified and billed to Medicare and Medicaid by Defendants. The following are representative examples of ineligible hospice patients for whom Defendants submitted or caused to be submitted false claims and for whom

Defendants received per-diem hospice care payments that would not have been paid but for Defendants' false representations:

a) Patient V.E., insured by Medicare, was re-admitted to end-of-life hospice care by the Homestead Hospice Columbia, South Carolina Agency on September 26, 2018 following a recent hospital discharge during which Patient V.E. revoked her prior hospice election. September 26, 2018 began Patient V.E.'s third hospice certification period. Patient V.E.'s admitting diagnosis—which will purportedly cause her death within six months—is "Unspecified atherosclerosis of native arteries of bilateral legs." Atherosclerosis is a condition in which plaque builds up in a person's arteries, or commonly referred to as "clogged arteries." While Atherosclerosis can lead to serious problems such as causing a heart attack or a stroke, it is not a terminal condition itself and therefore cannot be used as a medical justification that Patient V.E. will die within six months due to her clogged arteries. Additional information in Patient V.E.'s September 26, 2018 COTI Narrative Statement further demonstrates that Patient V.E. is not, in fact, terminally ill. For instance, Patient V.E. has a very healthy oxygen level of 98% and she only has shortness of breath with ambulation—which she is able to do with assistance of a walker. Most telling that Patient V.E. is simply an elderly patient with some chronic, but

not terminal, health issues is Homestead's justification that Patient V.E. "meets hospice criteria [due to] significant limitation in activities due to shortness of breath, weakness and chronic illness." Finally, this September 26, 2018 COTI is *per se* invalid, and false, because it is not even signed by any physician nor signed by the Homestead Nurse Practitioner responsible for performing a Face-to-Face Assessment to confirm Patient V.E.'s eligibility. On June 29, 2020, Patient V.E. was assessed for continuing eligibility by Homestead Nurse Practitioner James Goodson. Mr. Goodson's Face-to-Face Assessment demonstrates no decline over nearly two years. Patient V.E. has 99% oxygen saturation, does not wear prescribed oxygen and is able to ambulate. Homestead strains to justify eligibility by stating: [Patient V.E.] continues to meet hospice criteria [due to] shortness of breath with minimal activity, significant activity intolerance and continued need for assistance with most ADLs." As of August 28, 2020, Patient V.E. is still enrolled in Homestead Hospice Care. Therefore, Medicare is billed monthly and pays *per diem* payments to Homestead for Patient V.E., despite clear ineligibility.

b) Patient M.W., a patient with primary insurance under South Carolina Medicaid, was admitted to the Homestead Hospice Agency in Columbia, S.C. on May 11, 2020 under a purported terminal diagnosis of "abnormal

weight loss." At admission, Patient M.W. is documented as having lost 16 pounds in one month and 24 pounds in four months. However, Patient M.W. is documented at admission as a 79 year-old female, 5'7" tall and 176 pounds with a Body Mass Index of 27.6—which is still considered overweight. Clearly, any weight loss experienced by Patient M.W. would benefit her health, and is not a terminal condition. Moreover, Patient M.W.'s May 11, 2020 COTI is not signed by any physician and therefore *per se* invalid and all subsequent claims false. On July 14, 2020 Homestead Hospice Nurse Practitioner James Goodson performed a Face-to-Face evaluation and noted: "I evaluated [Patient M.W.] who is on service for significant weight loss prior to admission to hospice service as documented on admission. She reports her appetite has been good recently and states she has been gaining weight…Patient M.W. does not appear to meet hospice criteria based on diagnosis of weight loss as evidenced by weight gain since being on service since 05/2020. IDT will discuss appropriateness of continued hospice services." Despite Homestead's own clinicians documenting that Patient M.W. is not eligible for the Medicare Hospice Benefit, Patient M.W. was falsely certified as eligible and remains on service as of late August 2020 and Homestead Hospice continues submit false claims each month for Patient M.W.

c) Patient S.P., insured by Medicare, was admitted to the Selma, Alabama Homestead Hospice Agency on December 7, 2018 under a terminal diagnosis of COPD.  Patient S.P.'s conflicting and deficient medical documentation demonstrates Patient S.P. is ineligible for the Medicare Hospice Benefit.  Moreover, Patient S.P.'s medical records indicate she is improving while on hospice care and therefore should have been discharged.  Near her admission, on December 17, 2018, Patient S.P. is noted as having a 30% Palliative Performance Scale (PPS)[6] score. However, on December 9, 2018, Patient S.P. was documented as having a PPS score of 40%.  On December 9, 2019, Patient S.P. is documented as significantly improved with a PPS of 60%, and that she is her own primary caregiver and now only uses intermittent oxygen.  As of September 2020, Patient S.P., though clearly improved and ineligible, is still on taxpayer funded end-of-life care and each month Homestead bills Medicare for her care.

d) Patient E.A. was admitted to the Columbia, South Carolina Agency on April 17, 2018 under a diagnosis of Heart Failure and Hypertension.

---

[6] Palliative Performance Score (PPS) is a general scale that is used to measure the progressive decline of a palliative patient.  The score ranges from 100% (meaning a person able to do normal activity and work with no evidence of disease) to 10% (meaning totally bed-bound and unable to do any activity). 0% on PPS is death.  PPS also measures a patient's conscious level and intake level.

Pursuant to Homestead's corporate processes, Homestead Director of Nursing Kim Sussewell alerted the Homestead Hospice Corporate Clinical Leadership that Patient E.A. was not eligible for the Medicare Hospice Benefit on September 1, 2020 because she did not exhibit any symptoms for heart failure and commented "the narrative notes are getting difficult to write due to lack of decline in patient."  In response, Mr. Ali Kaviani noted that it was previously reported that Patient E.A. was determined to be ineligible and slated for discharge on January 15, 2020.  Accordingly, Homestead had direct knowledge that Patient E.A. was ineligible for at least 8 and a half months, but Patient E.A. was consistently recertified as eligible and each month falsely billed to the United States.  Defendants did not refund any of the money that it knowingly took from Medicare despite its acknowledgement the Patient E.A. was not terminally ill.

## COUNT ONE
### PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729(a)(1)(A)

137.  Relators adopt and incorporate paragraphs 1-136 as though fully set forth herein.

138.  By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be

presented false or fraudulent claims to the United States for payment or approval, to wit:

(a)    The Homestead Corporate Defendants and Defendant Abdsharafat submitted, or caused to be submitted, false claims for hospice care that was never provided for patients who never received a physician review of their diagnosis, prognosis, or care plan and who were not provided with regular review of their healthcare by a physician-led IDT.

(b) The Homestead Corporate Defendants and Defendant Abdsharafat submitted, or caused to be submitted, false claims for hospice care provided to patients who were not eligible or appropriate for the Medicare Hospice Benefit.

(c)    Homestead Corporate Defendants and Defendant Abdsharafat submitted, or caused to be submitted false claims for hospice care provided to patients whom had not been certified by a physician as terminally ill, in violation of 42 U.S.C. §1395f(a)(7)(A).

(d)    Homestead Corporate Defendants and Defendant Abdsharafat submitted or caused to be submitted false claims for hospice care provided to patients whose COTI did not include a physician's narrative and without required physician signatures, in violation of 42 U.S.C. §1395f(a)(7)(A).

(d)    The Homestead Corporate Defendants and Defendant Abdsharafat, submitted or caused to be submitted false claims for hospice services premised upon

Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

139.    The United States was unaware of the falsity or fraudulent nature of the claims described herein and paid claims it would not have paid but for Defendants' fraud.

140.    Homestead Corporate Defendants and Defendant Abdsharafat fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants and others by the United States through Medicare for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Homestead Corporate Defendants and Defendant Abdsharafat, jointly and severally, in an amount equal to treble the damages sustained by reason of these Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT TWO
### MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729(a)(1)(B)

141.    Relator adopts and incorporates paragraphs 1-136 as though fully set forth herein.

142.   By and through the fraudulent schemes described herein, the Homestead Corporate Defendants and Defendant Abdsharafat – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)   Homestead Corporate Defendants and Defendant Abdsharafat created and used false certifications of terminal illness and re-certifications of terminal illness, and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395f(a)(7)(A) and the Medicare regulations cited *supra*.

(b)   Homestead Corporate Defendants and Defendant Abdsharafat created and used fraudulently nursing notes, plans of care and other patient documents to substantiate its false claims.

(c)   Homestead Corporate Defendants and Defendant Abdsharafat made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendants were aware that their practices as described herein were in violation of

Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395f(a)(7)(A)(B).

(d) Homestead Corporate Defendants and Defendant Abdsharafat created and used false records and statements designed to make it appear that it provided physician review to its patients when, in fact, it did not.

143. The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Homestead Corporate Defendants and Defendant Abdsharafat to the United States.

144. In reliance upon these Defendants' false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

145. Homestead Corporate Defendants and Defendant Abdsharafat's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Homestead Corporate Defendants and Defendant Abdsharafat, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729,

attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT THREE
### FALSE CLAIMS BASED ON ANTI-KICKBACK STATUTE
### 31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1320a-7b(b)

146.   Relators adopt and incorporate paragraphs 1-136 as though fully set forth herein.

147.   By and through the fraudulent schemes described herein, Homestead Corporate Defendants and Defendant Abdsharafat knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

148.   By virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and submissions of non-reimbursable claims described above, Homestead Corporate Defendants and Defendant Abdsharafat knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of hospice services when such services were procured through illegal remuneration disguised as payment for medical director services.

149.   The Homestead Corporate Defendants and Defendant Abdsharafat target, recruit and contract with physicians to be Homestead Hospice Medical Directors based on the physicians ability and willingness to refer patients to

Homestead Hospice and willingness to falsely certify patients as eligible for the Medicare Hospice Benefit.

150.   The Homestead Corporate Defendants and Defendant Abdsharafat pay independent contractor Homestead Hospice Medical Directors exorbitant monthly stipends – far exceeding Fair Market Value – with no accountability for actual work performed to induce the referral and false certification of hospice patients.

151.   The United States, unaware of the falsity or fraudulent nature of the claims that the Homestead Corporate Defendants and Defendant Abdsharafat submitted and caused to be submitted, paid for claims that otherwise would not have been allowed.  Specific representative examples of patients and claims that were submitted to Medicare in violation of the Anti-Kickback Statute are referenced *supra* in paragraph 96.

152.   The Homestead Corporate Defendants and Defendant Abdsharafat's fraudulent actions have resulted in damage to the United States equal to the amount paid by the United States as a result of the Defendants' fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against the Homestead Corporate Defendants and Defendant Abdsharafat, jointly and severally, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as

permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## **COUNT FOUR**
### **CONSPIRACY UNDER 31 U.S.C. § 3729(a)(1)(C)**

153.   Relators adopt and incorporate paragraphs 1-136 as though fully set forth herein.

154.   The Homestead Corporate Defendants and Defendant Abdsharafat knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, to-wit: Defendants knowingly procured hospice patient referrals through illegal remuneration, falsely certified ineligible hospice patients and submitted or caused to be submitted false claims for hospice care.

155.   The United States paid Homestead Corporate Defendants and Defendant Abdsharafat for such false claims.

156.   The Homestead Corporate Defendants and Defendant Abdsharafat, in concert with its independent contractor Medical Directors, including but not limited to Dr. Albert Mims, Dr. Eli Chastain, Dr. Michael Gibson, did agree to submit such false claims to the United States.  Specific representative examples of patients and claims that were submitted to Medicare in furtherance of this conspiracy are referenced *supra* in paragraph 96.

157.    The Homestead Corporate Defendants and Defendant Abdsharafat and their principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

158.    The Homestead Corporate Defendants and Defendant Abdsharafat's fraudulent actions, together with the fraudulent actions of their principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against the Homestead Corporate Defendants and Defendant Abdsharafat, jointly and severally, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Relators may be entitled.

## COUNT FIVE
### "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

159.    Relators adopt and incorporate paragraphs 1-136 as though fully set forth herein.

160. By and through the fraudulent schemes described herein, the Homestead Corporate Defendants and Defendant Abdsharafat knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:  the Homestead Corporate Defendants knew that it had received hospice *per diem* payments for patients who were procured through illegal remuneration, patients that were ineligible to receive hospice care or not properly certified to receive hospice care, yet the Homestead Corporate Defendants took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

161. As a result of the Homestead Corporate Defendants and Defendant Abdsharafat's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by the Homestead Corporate Defendants and Defendant Abdsharafat.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against the Homestead Corporate Defendants and Defendant Abdsharafat, jointly and severally, in an amount equal to treble the damages

sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

**RELATORS DEMAND A TRIAL BY STRUCK JURY**

September 30, 2020

Respectfully submitted,

 _s/Ashley White Creech_
Ashley White Creech #10346
McGowan, Hood & Felder, LLC
1539 Health Care Drive
Rock Hill, SC 29732
(803) 327-7800
(803) 328-5656 (fax)
acreech@mcgowanhood.com


JAMES F. BARGER JR.
J. ELLIOTT WALTHALL
BENJAMIN P. BUCY
FROHSIN BARGER & WALTHALL
100 Main Street
Saint Simons Island, Georgia 31522
Tel:  205.933.4006
Fax:  205.933.4008
Email: jim@frohsinbarger.com
    elliott@frohsinbarger.com
ben@frohsinbarger.com


**Attorneys for Relators**

62

64